# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-00337-SCT

*THOMAS TUBBS a/k/a THOMAS E. TUBBS a/k/a*
*THOMAS EDWARD TUBBS a/k/a THOMAS*
*EDWARDS TUBBS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/2011 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| TRIAL COURT ATTORNEYS: | RICHARD EARL SMITH, JR. |
| | ANGELA CARPENTER |
| | LANE CAMPBELL |
| | EUGENE PERRIER |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/18/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Thomas Tubbs was indicted, tried, and found guilty by a Warren County jury of molestation and sentenced by the trial judge to fifteen years' imprisonment.[1] Aggrieved, Tubbs appeals to this Court, arguing the trial court erred in admitting the child-victim's testimony as well as a hearsay statement made by the victim to her grandmother. Tubbs also argues certain evidence should have been excluded due to a break in the chain of custody. Finding no error, we affirm Tubbs's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     On December 17, 2009, D.J.[2] was working late at the hospital, so her children stayed at the home of Thomas and Vernita Tubbs[3] until D.J. picked them up. D.J. picked up the children around 7:00 p.m. and took them straight home. When they got home, T.J. went to the restroom. T.J., then three years old, called for her mother's help. As D.J. was pulling up her underpants, T.J. said, "Thomas licked me."

¶3.     L.J. was living with D.J. and the children at the time. D.J. asked L.J. to come to the bathroom and asked T.J. to tell L.J. what had happened while D.J. left the room.  T.J. then pointed to her vagina and told L.J. that Tubbs had touched her.

---

[1]This was Tubbs's second trial. His first resulted in a hung jury. After his sentence, Tubbs waived his right to appeal. However, he petitioned the trial court and was granted permission to file this out-of-time appeal.

[2]To protect the identity of the child-victim in this case, only the initials of the victim, her mother, and her grandmother will be used. D.J. is the child's mother, L.J. is the child's grandmother, and T.J. is the child-victim. At the time of this second trial, T.J. was five years old.

[3]Vernita is T.J.'s great aunt, D.J.'s aunt, and L.J.'s sister.

¶4.     Investigator Randy Naylor collected the clothes that T.J. had been wearing and took them to the evidence room, where they were locked up by Raymond Elledge. Lieutenant Linda Hearn collected buccal (oral) swabs from Thomas Tubbs. Those swabs were placed in a box, which was then placed inside an envelope, and the envelope was sealed with evidence tape—all of which was provided in the swab kit. Hearn sealed the swabs and gave them to Investigator LaWanda Mallett, who gave the swabs to Naylor.

¶5.     The State's forensic expert, Kathryn Moyse Rogers, testified at trial that she had received the evidence (the swabs and the clothes) from Elledge. Although Rogers received the clothes and the swabs in the same bag, the envelope containing the swabs was sealed. Because the envelope was "perfectly sealed and would not interfere in any way with the panties inside [the] bag," Rogers deemed the evidence uncontaminated and proceeded with testing. A full Y-chromosome DNA profile developed from DNA removed from inside T.J.'s panties, which perfectly matched the DNA on Tubbs's buccal swabs.

¶6.     T.J. testified that Tubbs did "a bad something" in that "he touched me." When asked where, she pointed to her private parts.[4] Using a drawing, T.J. then identified parts of her body, those parts no one should touch, the part of his body Tubbs used to touch her, and where he touched her; she then wrote her name on the drawing. On cross-examination, T.J. testified that the State had shown her the picture she would use prior to testifying. While she

---

[4]While the record in this instance indicates only that "witness points to area on body," it is clear from the rest of the record that she pointed to her vagina.

did not know the exact date Tubbs touched her, she knew how old she was, she remembered that she was in day care at the time, and she knew the name of the day care center.[5]

¶7.	The defendant did not testify, but the jury heard two tape-recorded statements he gave to the two investigators. In the statement to Naylor, Tubbs posited that when T.J. said he "licked" her, she was referring to the fact he had spanked her. Tubbs gave a different excuse in his statement to Mallett: T.J. was doing flips in the bed and "flipped right in my face." Evidence of Tubbs's prior conviction for rape of a ten-year-old child was admitted for the limited purpose of proving, *inter alia*, motive, intent, or absence of mistake or accident.

¶8.	The jury found Tubbs guilty of molestation. After a presentence investigation and report, the court sentenced Tubbs to serve fifteen years in the custody of the Mississippi Department of Corrections. Tubbs appealed.

## STATEMENT OF THE ISSUES

I.	**Whether the trial court erred in admitting L.J.'s tender-years testimony.**

II.	**Whether the trial court erred in ruling T.J. competent to testify.**

III.	**Whether the trial court erred in admitting certain exhibits into evidence due to a break in the chain of custody.**

## STANDARD OF REVIEW

¶9.	The admissibility of evidence and competency determinations are left to the sound discretion of the trial court. *See Ellis v. State*, 934 So. 2d 1000, 1004 (Miss. 2006); *Mohr v.*

---

[5]Before allowing D.J., L.J., and T.J. to testify, the court conducted a hearing outside the presence of the jury to evaluate the admissibility of T.J.'s hearsay statements to her mother and grandmother as well T.J.'s competency to testify. The sufficiency of the hearing is challenged on appeal and is discussed more fully *infra*.

4

*State*, 584 So. 2d 426, 431 (Miss. 1991). This Court will affirm the trial court's ruling unless it can safely say that the trial court abused its discretion in allowing or disallowing evidence to the prejudice of the accused. *Ellis*, 934 So. 2d at 1004.

## ANALYSIS

### I.      L.J.'s Tender-Years Testimony

¶10. The tender-years exception to the hearsay rule is contained in Mississippi Rule of Evidence 803(25), which provides:

> A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

¶11. As T.J. testified at trial after the trial court conducted a hearing outside the presence of the jury, "the sole issue is whether the 'time, content, and circumstances of the statement provide substantial indicia of reliability.'" *Smith v. State*, 925 So. 2d 825, 837 (Miss. 2006). The comment to Rule 803 provides the following list of nonexhaustive factors trial courts should use to determine whether a statement possesses sufficient indicia of reliability:

> (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12)

whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated.

M.R.E. 803(25) cmt.

¶12.    While L.J., the grandmother, did not testify at the evidentiary hearing, her proposed testimony was proffered to the judge. The trial court made specific findings of fact and conclusions of law. The court determined the statement (to the mother) was made within a short time after the child was in "a place where the child felt safe or felt unencumbered by any threats by anyone . . . and that the child was able to give an unsolicited response." The child repeated that statement to her grandmother (L.J.). The court discussed how there was a good relationship at the time between the mother, grandmother, and Tubbs. "There was no ulterior motive[,]" no argument between L.J. and Tubbs, and no animosity between them. The court found the child had a close relationship with her grandmother and that there was no reason for her to fabricate testimony. Finally, the court found it was up to the jury to determine whether the event happened as T.J. said it happened.[6] The defendant argues the failure of the court to use the specific words "substantial indicia of reliability" was error.

¶13.    We find the trial court's evidentiary hearing contains more than sufficient findings on the record. While the trial court did not use the specific words, it did not abuse its discretion

---

[6]Tubbs argues that T.J.'s statement to D.J. that Tubbs licked her and her statement to L.J. that Tubbs touched her are inconsistent, which "undercuts 'whether more than one person heard the statements[.]'" However, Tubbs overlooks the legal argument that "licking" is "touching" under the statute. *See* Miss. Code Ann. § 97-5-23 (Rev. 2014) (defining fondling as "touch[ing] or rub[bing] with hands or any part of his or her body or any member thereof . . . .").

in allowing L.J. to testify as to T.J.'s statement to her pursuant to the tender-years hearsay exception of Rule 803(25).

## II. T.J.'s Competency to Testify

¶14. Children of tender years may testify as long as they are deemed competent, and the competency of a child witness is in the sound discretion of the trial court. *Mohr*, 584 So. 2d at 431. "Before allowing the child to testify, the judge should determine 'that the child has the ability to perceive and remember events, to understand and answer questions intelligently[,] and to comprehend and accept the importance of truthfulness.'" *Id.* (quoting *House v. State*, 445 So. 2d 815, 827 (Miss. 1984)). This Court gives deference to such findings, for the trial judge alone among the judiciary observed the manner and demeanor of the child and heard her testimony; he "smelled the smoke of battle." *See Rochell v. State*, 748 So. 2d 103, 110 (Miss. 1999).

¶15. Tubbs argues the trial court failed to determine whether T.J. "possessed the ability to perceive and remember the events." However, the test is not whether the child can remember *the* event, but whether the child can "perceive and remember events." *See Mohr*, 584 So. 2d at 431. The trial court determined T.J. was able to remember events. She remembered the judge from the previous trial. She knew how old she was, that she went to school, and the names of her teachers.

¶16. As to her ability to comprehend and accept the importance of truthfulness, she knew she would get in trouble if she acted up at school and knew that it was bad to say someone did something that he or she really did not do. When asked what happened to people who tell

7

stories on other people, she responded, "They get in trouble." When asked by whom, she said, "Your parents" and that "[God] will punish you." All of her answers at the hearing evidence her ability to understand and answer questions intelligently. The court then questioned D.J., who stated that she had received no bad reports from T.J.'s teachers and that T.J. was reading almost on a first-grade level while still in kindergarten.

¶17.    The trial court then determined that T.J. had sufficiently shown that she could understand  what it means to tell a lie versus telling the truth, and that she knew that telling a lie "can get you in trouble with both man and God." The court determined the issue whether or not she could remember the exact event went more to the weight of her credibility, which was for the jury to evaluate.[7]

¶18.    The trial court did not abuse its discretion in deeming T.J. competent to testify.[8]

### III.    The Chain of Custody

¶19.    The test of whether there has been a break in the chain of custody is "whether there is an indication or reasonable inference of probable tampering with the evidence or substitution of the evidence." *Ellis*, 934 So. 2d at 1005. "'[T]he presumption of regularity

---

[7]In her trial testimony, T.J. remembered being in day care when she was three years old, her teacher's name, and the name of the day care. She could not remember exactly when the incident occurred.

[8]Tubbs argues no evidence was introduced at the preliminary hearing to establish that T.J. had personal knowledge of the incident. *See* M.R.E. 604 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself."). Yet, sufficient evidence was introduced that T.J. had personal knowledge of the incident. At trial, she herself testified that Tubbs touched her, pointed to where, and demonstrated it on the diagram. Additionally, the DNA evidence corroborated that it happened.

supports the official acts of public officers,' and the burden to produce evidence of a broken chain of custody (*i.e.*, tampering) is on the defendant." *Id.* (quoting *Nix v. State*, 276 So. 2d 652, 653 (Miss. 1973)). "Mississippi law has never required a proponent of evidence to produce every handler of the evidence," and "[a] mere suggestion that substitution could possibly have occurred does not meet the burden of showing probable substitution." *Id.*

¶20. In *Ellis*, the deputy testified that he had transported the evidence (tubes of blood) to the Mississippi Crime Laboratory (MCL). *Id.* at 1004. From MCL, the blood was forwarded to a different lab for testing. *Id.* at 1002. An employee at the second lab testified that the blood was received from MCL. *Id.* The defendant argued there was a break in the chain of custody because the person at MCL who forwarded the blood to the second lab did not testify. *Id.* at 1002-03. The defendant also objected because the nurse who drew the blood "may have mislabeled the tubes by inadvertently swapping the names [of the two suspects]." *Id.* at 1004. No testifying witness "gave any reason for the jury to believe that anything irregular occurred with this evidence," and we held the trial court did not abuse its discretion in admitting the evidence. *Id.* at 1006.

¶21. Here, Tubbs argues there was a break in the chain of custody because Elledge did not testify. He also argues that the fact that an excessive amount of male DNA was found on T.J.'s underpants "suggests that an officer went overboard planting Tubbs'[s] DNA on the panties with an extra swab."

¶22. Investigator Naylor testified he gave the evidence to Elledge. Kathryn Rogers testified she received the evidence from Elledge. Every handler of the evidence need not testify, and

a presumption of regularity attaches to the acts of these public officers. *See **Ellis***, 934 So. 2d at 1005. The defendant offered no evidence that anything irregular occurred. Tubbs's "mere suggestion that substitution could possibly have occurred does not meet the burden of showing probable substitution." ***Id.*** As such, the trial court did not abuse its discretion in admitting the evidence.[9]

## CONCLUSION

¶23.    For the reasons stated, the judgment of the Warren County Circuit Court is affirmed.

¶24.    **CONVICTION OF MOLESTATION AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL PAY A FINE IN THE AMOUNT OF $5,000, COURT COSTS IN THE AMOUNT OF $156, AND STATE ASSESSMENTS IN THE AMOUNT OF $166.50.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**

---

[9]"'[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.'" ***Deeds v. State***, 27 So. 3d 1135, 1143 (Miss. 2009) (quoting ***U.S. v. Lott***, 854 F. 2d 244, 250 (7th Cir. 1988)).